## VANTINE & CO. ET AL. *v.* UNITED STATES (No. 1984).[1]

1. CONSTRUCTION, PARAGRAPHS 79 AND 80, TARIFF ACT OF 1913—"NONVITRIFIED ABSORBENT" — "VITRIFIED NONABSORBENT" — "VITRIFIED" — "SEMIVITRIFIED"—"SEMIVITREOUS."

When Congress provided in paragraph 79, tariff act of 1913, for a nonvitrified absorbent body and in paragraph 80 for a vitrified nonabsorbent body with the further provision that the latter, when broken, must show a vitrified or semivitrified or vitreous or semivitreous fracture, it understood that such wares as are dealt with in the paragraphs, if entirely vitrified are nonabsorbent, if entirely nonvitrified are absorbent; and that, when partially vitrified they may be absorbent or nonabsorbent, depending upon the degree of vitrification. "Vitrified" means substantially converted into glass. "Vitreous" means consisting of or resembling glass in its important characteristics. The words "semivitrified" and "semivitreous," in paragraph 80, do not require the bodies of the wares to be 50 per cent or more vitrified in order to warrant classification under the paragraph; vitrification to an appreciable extent, and not to a negligible degree only, is sufficient. Any power of absorption whatever is not sufficient to exclude merchandise from paragraph 80.

2. CHINAWARE, SEMIVITRIFIED AND NONABSORBENT—"BANKO WARE."

Chinaware known as "banko ware," shown to be about half vitrified and wholly nonabsorbent, was correctly classified accordingly under paragraph 80, tariff act of 1913, rather than under paragraph 79. A showing that chinaware, when permitted to stand immersed in water, or when boiled in water, absorbs some water, but less than half of the quantity absorbed by some such wares, with no other showing as to the quantity absorbed, is not sufficient to support a protest against the collector's classification as "nonabsorbent" (par. 80), claiming classification as "absorbent" (par. 79).

United States Court of Customs Appeals, December 12, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8256 (T. D. 38012).

[Affirmed.]

*Sharretts, Coe & Hillis* (*Edward P. Sharretts* of counsel) for appellants.
*Bert Hanson*, Assistant Attorney General (*John J. Mulvaney*, special attorney, of counsel), for the United States.

[Oral argument Oct. 10, 1919, by Mr. Edward P. Sharretts and Mr. Hanson.]

Before SMITH, BARBER, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court.

This case involves two protests, 850436 and 850555.

The merchandise is chinaware. The question is whether it is classifiable under paragraph 79 or 80 of the tariff act of 1913. We quote the material parts of each paragraph:

79. Earthenware and crockery ware composed of a nonvitrified absorbent body, including white granite and semiporcelain earthenware * * *.

80. China and porcelain wares composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, and all bisque and parian wares * * *.

There are different rates of duty under each of these paragraphs, depending upon whether or not the merchandise is painted, colored, tinted, stained, etc. These wares are so painted or otherwise treated that they are concededly dutiable at the higher rate provided in either of the paragraphs, assuming them to be dutiable thereunder. They were assessed under paragraph 80. Importers protested, claiming, among other things, classification under paragraph 79, and the Board of General Appraisers, after full hearing, overruled the protests.

Under protest 850555 two samples are submitted as typical of the importation, one an entire plate or saucer and the other a broken fragment of a similar article.

The particular name of the merchandise covered by protest 850436 seems to be "banko ware," and one sample, a broken piece, is before us, but of what entire article it is a part the record does not show nor the sample indicate.

In the brief of the importers it is stated that the general character of the merchandise, referring to both protests, is plates, cups, saucers, etc., and by the answers to the protests we are advised the importations include also teapots, umbrella stands, fruit baskets, and trays.

It is agreed that these paragraphs of the act of 1913 are the latest if not the first attempt of Congress to divide this kind of merchandise for duty with regard to its vitreous or absorbent qualities. Reference to the act of 1909 shows that, generally speaking, similar merchandise was covered by two paragraphs, 93 and 94, relating, among other things, to "china, porcelain, parian, bisque, earthen, stone, and crockery ware"; paragraph 93 providing for a higher rate of duty thereon if painted, colored, etc., or ornamented or decorated in any manner, and paragraph 94 for a lower rate for the same merchandise if "plain white" or "plain brown" and if *not* painted, colored, etc., or ornamented or decorated in any manner.

Paragraphs 79 and 80 of the act of 1913 also make a similar distinction between such of these wares as are painted or decorated, etc., and those that are not, and also establish an additional preliminary qualification resting upon the qualities or characteristics of the material of which the bodies of the wares are composed. If the body of the ware is nonvitrified and absorbent it falls under paragraph 79. If vitrified and nonabsorbent and so constituted that when broken it shows a vitrified or vitreous or semivitrified or semivitreous fracture, it falls under paragraph 80.

At the hearing before the Board of General Appraisers the only witness on behalf of the importers, Dr. Berkey, of Columbia University, testified to having made a scientific test of the samples of the merchandise to determine their degree of vitrification, in the course of which he used the microscope and took photomicrographs. He

submitted the samples to immersion in water for 24 hours and also boiled them for an hour, the two latter operations being to determine their power of absorption.

As a result of these tests he concluded that the merchandise covered by 850555 was, to use his own language, "about 75 per cent unvitrified and 25 per cent vitrified." The witness was asked as to the absorbent qualities of the merchandise covered by this particular protest, the evidence coming in as follows:

Q. What in your opinion was the degree of absorption shown by the piece as compared with the degree of absorption of a perfectly porous piece?—A. Perfectly porous?

Q. Take the ordinary common earthenware about which there is no question?— A. There is a difference of very, very, many per cent in the amount of absorption between this ware and a very porous piece.

Q. Could it be expressed in different percentages?—A. There are all grades of porosity in such wares taking in from 15 to 20 per cent down to nothing, and between those two things this is nearer to the nothing than it is to the 15 or 20 per cent.

Precisely what he meant by this conclusion in his last quoted answer he does not explain. We assume it to mean that the greatest amount of water wares of this general character will absorb is 20 per cent of their weight, because he testified that in making the tests he weighed the samples both before and after immersion or boiling to see how much "water the article had taken in" and so the legitimate inference from his testimony seems to be that the most porous wares will take in from 15 to 20 per cent of their weight in water and that the amount of water that would be absorbed by the articles covered by the protest now immediately under consideration was nearer to nothing than to 15 or 20 per cent of their weight. He also testified in another connection that he concluded from his tests that these wares possessed some degree of absorption and sufficient to satisfy him that they "would have to go into the absorbent class," but he did not state the percentage of water that the wares here which he tested had taken up, nor just what he meant by the "absorbent class."

As to the merchandise covered by 850436 he concluded that it was almost half vitrified and half nonvitrified, although he said it was more difficult to judge the proportion than it was as to that covered by the other protest, but he found that it was totally nonabsorbent.

The Government introduced two witnesses, one who had been in the pottery manufacturing business in this country for 39 years and was familiar with the methods and processes of manufacturing pottery and chinaware in the United States. He testified that the merchandise covered by protest 850555 was an extremely hard piece of ware possessing very slight absorptive powers. He judged this from the appearance of the fracture, by testing it with his tongue and by applying red ink to a fractured surface.

The red-ink test in substance consists in immersing a fractured surface in, or applying the ink to the fracture, to ascertain to what

extent it will be taken up by the body of the ware, the color enabling visual inspection to determine whether absorption has or has not taken place, and if any, somewhat as to the degree thereof. The testimony of record demonstrates that the red-ink test is one method commonly used by the trade to determine the degree of absorptive power possessed by these wares. This first witness for the Government in connection with his testimony produced various samples of wares, some of which he said showed nonvitrified absorbent bodies and others vitrified nonabsorbent bodies, and in his testimony he instituted comparisons showing either the presence or absence, as the case might be, of the qualities prescribed in paragraph 80 and also compared these wares with the samples of the imported merchandise.

Another witness for the Government testified that he had been in the pottery and china business for 25 years and deemed himself familiar with the classes of wares represented by the exhibits under protest 850555, and which he said were bought and sold as Canton china. He testified that in his opinion the body of the typical exhibits was composed of vitrified nonabsorbent substances or semivitrified or vitreous substances, but the record fails to disclose clearly that he made any tests other than an ocular inspection to so determine.

We have before us all the exhibits introduced by both sides.

The Government also offered evidence tending to show that the provisions of the paragraphs in question had a commercial meaning and that the merchandise here was within the commercial understanding of the meaning of the descriptive term used in paragraph 80.

Upon this question the Board of General Appraisers seems to have found that the Government had failed to establish commercial designation, and we so conclude.

As to the importation covered by 850436, in view of the testimony of importers' witness, which seems to have been accepted as conclusive as to the character of that merchandise, and that it was about one-half vitrified and totally nonabsorbent, we are of opinion without further discussion that it was properly assessed by the collector at the higher rate of duty under paragraph 80, and that the board correctly affirmed the collector's action so far as relates thereto.

As to the articles covered by protest 850555, there may be more room for a difference of opinion. It is apparent that Congress when it provided in paragraph 79 for a nonvitrified absorbent body and in paragraph 80 for a vitrified nonabsorbent body with the further provision that the latter when broken must show a vitrified or semivitrified, or vitreous or semivitreous fracture, understood the fact to be, and it is clearly demonstrated by the evidence here, that these wares if entirely vitrified are nonabsorbent, if entirely nonvitrified are

absorbent, and that when partially vitrified, they may be absorbent or nonabsorbent, depending upon the degree of vitrification.

It is argued here and we so understand, that speaking generally, china and porcelain wares always have a glassy surface which has been produced by what may be termed a surface vitrification rendering the surface nonabsorbent. Of course, if entirely vitrified, the body would not only be nonabsorbent but when broken would show a vitrified fracture. Congress evidently did not wish to limit paragraph 80 to that quality of ware and so provided that if when fractured it showed a vitrified or semivitrified or vitreous or semivitreous fracture and was also nonabsorbent, it should be classified thereunder. The wares covered by protest 850555 are not entirely vitrified and whether they are semivitrified or vitreous or semivitreous is to be determined. This leads to inquiry as to the meaning of these words. Both sides refer to the dictionaries in support of their respective contentions. Without quoting from the same it is sufficient to say that "vitrified" will be commonly understood to mean substantially converted into glass, and "vitreous" as consisting of or resembling glass in its important characteristics. So far the parties practically agree. The disagreement is based chiefly on the meaning of the prefix "semi," the importers contending in substance that if it appears that these wares are considerably less than half vitrified and at the same time shown to be absorbent, they are not dutiable under paragraph 80 and that Congress intended to confine paragraph 80 to wares the body of which contained 50 per cent or more vitrification, provided such vitrification was sufficient to render the body of the ware nonabsorbent. The Government contends that in using the words "semivitreous" or "semivitrified" Congress intended to use them in their popular signification as they were applied in the trade, and if the fractures show the bodies of the wares to be sufficiently vitrified to render them substantially nonabsorbent, the call of the paragraph is satisfied.

We think no very satisfactory conclusion can be reached by undertaking to give controlling force to the prefix "semi," because of its indefinite meaning as very often used. Strictly speaking, "semi" means "half." It also means "partly," and in common parlance is very often applied to a condition of less than half and also to a condition which is not susceptible of definite proportionate ascertainment. "Semiannual" is an illustration of its definite use as meaning "half." "Semi-intoxicated" is an example of its indefinite use arising from the uncertain nature of the condition described.

We are of opinion that the words "semivitrified" and "semivitreous" as used in paragraph 80 do not require the bodies of the wares to be 50 per cent or more vitrified in order to warrant classification thereunder.

Although, as the importers claim, it may in a measure have mistaken their contentions, the Board of General Appraisers in this case upon the consideration of all the evidence has found in effect that this merchandise is partially vitrified—that is, vitrified to an appreciable extent and not to a negligible degree only—in which conclusion we agree, and we are of opinion on this record that it is at least semivitreous, if not semivitrified, assuming there is any difference in the meaning of those terms. But it became the duty of importers under the protests to show that the merchandise was absorbent. The most they have shown is that when permitted to stand immersed in water and also when boiled in the same fluid, it possesses some power of absorption; to what extent does not appear, except that it is nearer nothing than the maximum power possessed by porous wares. We do not think this showing is sufficient to overcome the presumption of correctness which attaches to the collector's classification, supported to the extent it is by the testimony we have referred to. To sustain the importers' contention, in view of the evidence, would be almost, if not quite, to hold that any power of absorption whatever would exclude this merchandise from paragraph 80. We are unwilling to commit ourselves to this view.

This conclusion makes it unnecessary to consider importers' contention that the merchandise is classifiable under paragraph 81.

The judgment of the Board of General Appraisers is *affirmed*.