(C.D. 2230)

GENERAL CERAMICS CORPORATION *v.* UNITED STATES (R. J. SAUNDERS CO., INC., A/C THE FERROXCUBE CORP. OF AMERICA, PARTY IN INTEREST)

## United States Customs Court, Third Division

(Decided January 16, 1961)

*Michael Stramiello, Jr.*, for the plaintiff.

*George S. Leonard*, Acting Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.

*Jordan & Klingaman* (*Edward F. Jordan* of counsel) for the party in interest.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: This is a protest, filed by an American manufacturer pursuant to section 516(b) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, against the collector's assessment of duty on certain so-called ferrite articles described as follows:

| Entry No. | Date | Invoice No. | Invoice description |
|---|---|---|---|
| 475491 | 10/23/59 | 25275 | 56.907.49/3E1 Ferroxcube E Cores |
| | | 25276 | K5281 35/6F Square Loop Rings |
| 477281 | 10/30/59 | 25288 | K3 000 61 Ferroxcube Potcores |
| | | 25289 | K3 005 02/3E1 Ferroxcube Toroids |
| | | | K3 005 00/3E1 Ferroxcube Potcores |
| | | | K5281 35/6F Square Loop Rings |
| | | | Ferroxdure I Blocks, unmagnetized |

Said articles were classified by the collector as articles in chief value of earthy or mineral substances, not specially provided for, not decorated, and assessed with duty at 15 per centum ad valorem under paragraph 214 of said tariff act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802. It is claimed that the merchandise is properly dutiable at 45 per centum ad valorem under paragraph 212 of said tariff act, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877, as articles made of vitrified ware, composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, not table or kitchenware, table or kitchen utensils, or chemical stoneware, and not containing 25 per centum or more of calcined bone.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 212, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877:

212 China, porcelain, and other vitrified wares, including chemical stoneware (but not including chemical porcelain ware, sanitary ware and fittings and parts therefor, or electrical porcelain ware), composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, * * * and all other articles composed wholly or in chief value of such ware; all the foregoing, whether

plain white, painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for:  ¨

\* \* \* \* \* \* \*

Articles which are not tableware, kitchenware, table or kitchen utensils, or chemical stoneware, and which do not contain 25 per centum or more of calcined bone_____ 45% ad val.

Paragraph 214, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Earthly or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not \* \* \*:

If not decorated in any manner:

\* \* \* \* \* \* \*

Other_____ 15% ad val.

At the trial, Louis Gurian, a chemist in the United States Customs Laboratory, testified that he had analyzed and tested samples withdrawn from entries numbered 477281 and 475491 by determining absorbency, by microscopic examination, and by qualitative analysis.

These samples were received in evidence as plaintiff's collective exhibit 2 and exhibit 3. Exhibit 2(a) consists of an article from entry No. 477281 called a potcore. It is a round, flat object, about 1 inch in diameter and three-eighths of 1 inch high. It appears to be made of a dark substance which is cold and metallic to the touch. Exhibit 2(b) consists of two broken pieces of a small, round object, parts of a cupcore or potcore, apparently made of the same substance as that of exhibit 2(a). Exhibit 2(c) consists of larger pieces of a round object, apparently made of the same substance, but painted or colored green. Exhibit 3 is from entry No. 475491 and consists of very tiny rings, called ferrite loop rings.

Mr. Gurian's reports as to these samples state:

The sample of loop rings is composed essentially of manganese copper ferrite having a vitrified nonabsorbent body containing no calcined bone.

Copper content less than 4%. [Plaintiff's exhibit 4.]

The sample marked K3–000–61, is a circular core 1 inch diameter and is composed essentially of manganese and zinc ferrite with a small amount of combined metallic oxides. It has a vitrified nonabsorbent body containing no calcined bone.

The sample marked K3–00500/E1, is a green colored ring, 1⅝ inch diameter and is composed essentially of manganese and zinc ferrite with a small amount of combined metallic oxides. It has a vitrified nonabsorbent body containing no calcined bone. [Plaintiff's exhibit 5.]

The witness stated that in order to determine absorbency, he fractured the sample so that 50 per centum of the fractured surface was exposed, dried it for 24 hours in a drybox at 110 degrees C., then let

it cool, weighed it, and submerged it in water for 48 hours. He then removed it, dried it quickly, and weighed it again, and found no gain in weight, or, in other words, zero absorbency. He examined the fracture under a microscope and found it had a glasslike or vitreous appearance. From these tests, the witness concluded that the samples each had a vitrified nonabsorbent body. He explained that when he observed the fracture through the microscope, he did not see the structure, but saw the surface which appeared to be glassy.

Christopher L. Snyder, vice president of General Ceramics Corp., producer of industrial ceramic materials, including ferrites, testified that his company makes articles similar to the imported merchandise, some of which were received in evidence as plaintiff's exhibit 6 and collective exhibit 7. Exhibit 6 consists of various small rings, called square loop rings and potcores. Collective exhibit 7 consists of larger round rings, called ferrite toroids, made of a dark metallic-feeling substance.

The witness described the method of production as follows:

> The method of manufacture employed is a typical ceramic manufacturing process, in which the various raw materials, such as powders, are intimately mixed together. A slight amount of carbonation binder is added to them. They may be formed in several different ways; pressing steel molds, extruding through a novel cavity. After forming, they are raised to a high temperature, sometimes in air, sometimes in controlled atmosphere.

He explained that the temperatures ranged from 1,000 to 1,400 degrees C. and that the high temperature promotes a chemical reaction or composition of the ingredients, forming a crystal, which gives the substance its desired magnetic properties. The materials used are ferrites, which contain iron oxide and other bivalent metallic oxides, such as copper, nickel, manganese, zinc, and magnesium. The binders are a variety of vegetable gums, gum arabic, gomme-gutte, and polyvinyl alcohol. They form carbon dioxide when the materials are heated and burn out.

According to the witness, one of the purposes of the manufacturing process is to vitrify the ferrites; they are vitrified by the process; and they are nonabsorbent and have a vitrified or vitreous fracture. In his view, articles are vitrified when they are dense and nonabsorbent. He added that the body structures of these ferrites are crystalline; that there is very rarely a conversion to glass in the material; that there is no glass present in the body structures; that the property desired is ferro-magnetism; and that a crystalline body structure is essential for that purpose. He said that to determine whether or not a product is vitrified or vitreous, it is tested for absorption from water and qualitatively from its appearance, fracture.

The witness testified that he had seen such articles made in other plants in this and other countries and that the materials, processing,

and use were substantially the same. They are used as magnetic material for the improvement of inductors, to increase their efficiency, and decrease their losses. The square loop rings are used in computers as memory cores, bi-stable devices to store energy.

Mr. Snyder produced samples of articles which his company had painted, colored, or enameled (plaintiff's exhibits 9 and 10). He explained that memory cores are colored to identify them and to cause them to radiate heat more easily; that cupcores are painted with red and green dots to identify the material; and that toroids are painted to protect the surface and soften the corners so that when wire is wound around them, it does not break so easily. The coloring is for practical purposes, not for ornamentation.

Lewis D. Andrews, director of research and engineering of the Stackpole Carbon Co., manufacturer of carbon products and electronic component parts, including ferrites, testified that his company made articles like those before the court, except square loop rings; and that they are painted, colored, or enameled for protection against mechanical abrasion; to increase the surface resistivity of the material, or for identification but never for decoration. Samples of such merchandise were received in evidence as plaintiff's exhibits 11, 12, and 13.

The party in interest called as a witness Frank G. Brockman, who is in charge of research in ferrites at Philips Laboratory, an associate of North American Philips and the Ferroxcube Corp. of America. Dr. Brockman is a pharmaceutical chemist, and received a Ph. D. in chemistry from the University of Pennsylvania in 1934. His experience with ferrites began in 1945, when he was sent to Holland to work with J. L. Snoek, an accredited pioneer in modern ferrite development. His activities in the field of magnetic oxide materials have continued since that time.

The witness stated that the materials used in the production of ferrite products are oxides of iron, zinc oxide, manganese oxide, and manganese carbonate. None of these is a glass-forming oxide, according to the witness, but there is the possibility that a small percentage of silica, 0.1 per centum or 0.2 per centum, a glass-forming oxide, may be present as an impurity. In the course of manufacture, the ingredients are mixed, partially converted into ferrites, broken up again and mixed with a binder, pressed or extruded, and then fired at high temperatures. The essential property being sought is ferromagnetism for which the body structure must be crystalline. If any of the body material had been converted into glass, it would reduce the permeability and have other detrimental effects on the magnetic properties. It is desirable to have as high a density as possible in order to obtain the highest magnetic properties and to exclude moisture.

Dr. Brockman explained that ferrites are wholly crystalline, but that china and porcelain are partially crystalline with a substantial and detectable glassy portion. In his opinion, it is not possible to say whether the body structure is crystalline or glassy or vitreous by mere observation under a microscope. Although one can tell by observation whether the fracture is like the fracture of glass, even if such fracture appears glassy, it does not necessarily follow that the body structure of the material is, in fact, wholly or partly glassy.

Plaintiff claims that these ferrite articles are vitrified wares, composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, properly dutiable under paragraph 212 of the Tariff Act of 1930, as modified. It is the view of the party in interest, however, that these articles are not vitrified or semivitrified within the common meaning of those terms and are not vitrified ware within the purview of paragraph 212, as modified.

It is evident from the language of paragraph 212, *supra*, that in order to meet the requirements thereof the articles or wares in question must have a body which is (1) vitrified, (2) nonabsorbent, and (3) which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture.

Since the uncontradicted evidence in this case is that the articles are nonabsorbent, the issue presented is whether they have vitrified bodies which when broken show the required fracture.

The terms "vitrify," "vitreous," and "vitrification" have been defined as follows:

Webster's New International Dictionary, 1953 edition:

vitrify, To change into glass or a glassy substance, by heat and fusion; to make or become vitreous.

vitreous, 1. Of, pertaining to, or derived from, glass. 2. Like glass, as in color, composition, brittleness, luster, etc.; glassy; as, *vitreous* rocks.

Funk & Wagnalls New Standard Dictionary, 1931 edition:

vitrify, 1. *t.* To fuse into glass or glasslike appearance wholly or only on the surface; cause to be vitreous or covered with a glaze. II *i.* To become glass or glassy.

vitreous, 1. Of, pertaining to, or consisting of glass; glassy; as, a *vitreous* slag. * * * 3. Resembling glass in some property or properties, as brittleness, composition, hardness, structure, or translucency; vitriform; as, *vitreous* humor; *vitreous* fracture.

Rose, The Condensed Chemical Dictionary, fifth edition:

vitreous. Glass-like in luster, color, brittleness, and composition.

vitrification. The process of converting into glass or a glassy substance by heat and fusion.

In *Vantine & Co.* v. *United States*, 9 Ct. Cust. Appls. 291, 295, T.D. 38225, the court stated that " 'vitrified' will be commonly understood

to mean substantially converted into glass, and 'vitreous' as consisting of or resembling glass in its important characteristics." That case arose under the Tariff Act of 1913, which provided for "China and porcelain wares composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture" (paragraph 80). It was held that the words "semivitrified" and "semivitreous" did not require that the bodies of the wares be 50 per centum or more vitrified, but that if the merchandise was vitrified to an appreciable extent and not to a negligible degree, it was classifiable under the paragraph.

A subsequent case, *Vandegrift & Co.* v. *United States*, 15 Ct. Cust. Appls. 165, T.D. 42221, involved fish-spine beads, composed in chief value of talc or steatite, and stipulated to be articles or manufactures composed wholly or in chief value of vitrified or vitreous ware. The court held that the merchandise was not classifiable as beads under paragraph 1403, Tariff Act of 1922, and was more specifically provided for as articles made of vitrified ware under paragraph 212 than as manufactures of talc or steatite under paragraph 209. The court quoted dictionary definitions of the terms "vitrify" and "vitrified" and then stated (p. 170):

* * * the provision for articles of vitrified ware includes only such articles as are made of substances specially treated or processed, and thereby converted wholly or externally into glass or a glassy substance.

The *Vantine* case was called to the attention of Congress when the Tariff Act of 1922 was being enacted (Summary of Tariff Information, 1920, p. 148) and the *Vandegrift* case when the Tariff Act of 1930 was being enacted (Summary of Tariff Information, 1929, p. 487). While the words "other vitrified wares, including chemical porcelain ware and chemical stoneware" were added to the china and porcelain ware provision by the acts of 1922 and 1930, no changes were made in the language describing the composition of such ware. Since Congress had actual notice of the decisions, its reenactment of the language interpreted by our court of appeals is tantamount to adoption of that interpretation. *United States* v. *The Water Treatment Co. of America, etc.*, 33 C.C.P.A. (Customs) 174, C.A.D. 332; *International Expediters, Inc.* v. *United States*, 41 C.C.P.A. (Customs) 156, C.A.D. 543. The additional provision for other vitrified wares, including chemical porcelain and stoneware, does not, of course, change in any way the requirement that such wares have vitrified nonabsorbent bodies which when broken show the specified fracture.

In the Summary of Tariff Information, 1921, page 298, it was suggested that the words "vitrified nonabsorbent" be omitted before the word "body" in order to avoid conflict with the words "semivitrified or semivitreous" before "fracture." Since this was not done,

it is evident that Congress intended that the wares and articles covered by paragraph 212 have vitrified bodies as well as the specified fracture.

In a more recent case, *Maher-App & Company* v. *United States*, 44 C.C.P.A. (Customs) 22, C.A.D. 630, it was held that the expression "composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture" was exclusionary and that articles which did not show such fracture could not be classified under paragraph 212 by similitude.

In view of these cases, we conclude that to be classifiable under paragraph 212, an article must have a body which has been converted wholly, partially, or externally into glass or a glassy substance, to an appreciable degree, and that it must show a vitrified or vitreous, or semivitrified or semivitreous fracture.

In the instant case, Mr. Gurian gave his opinion that the merchandise had a vitrified body on the basis of an absorption test and on his examination of the fracture, which he said was glasslike in appearance. He did not know whether the body structure was crystalline or glassy. Although Mr. Snyder stated that one of the purposes of the manufacturing process was to vitrify the articles, he admitted that there was only rarely a conversion to glass during the process and that there was no glass present in the body structures of the articles before the court.

Dr. Brockman testified that none of the material used in producing the articles was glass forming with the exception of silica which might be present in a very small quantity as an impurity; that the body structure of ferrites is wholly crystalline, whereas china and porcelain are partially crystalline with a detectable percentage of a glassy portion; that a conversion into glass would be detrimental to the desired ferromagnetic properties. In his opinion, even though the fracture looked glassy, it did not follow that the body structure was wholly or partly glassy.

Glass has been defined as an amorphous, hard, brittle substance, usually transparent or translucent, breaking with a conchoidal fracture, ordinarily made by the fusion of silica, oxides, borates, or phosphates, followed by sufficiently rapid cooling to prevent crystallization of the components. Webster's New International Dictionary, 1953 edition; Funk & Wagnalls New Standard Dictionary, 1931 edition; Thorpe's Dictionary of Applied Chemistry, 1941 edition, volume 5, pages 537–538; Rose, The Condensed Chemical Dictionary, 5th edition, page 522; Van Nostrand's Scientific Encyclopedia, page 522. Glass is regarded by many technologists as a state rather than any given substance. Thorpe's Dictionary of Applied Chemistry, 1941 edition, volume 5, page 538. It is considered to be an undercooled or supercooled liquid or a disordered amorphous solid, having attained so high a de-

gree of viscosity as to be virtually rigid. Rose, The Condensed Chemical Dictionary, 5th edition, page 522; Van Nostrand, The International Dictionary of Physics and Electronics, page 968; Collier's Encyclopedia, volume 9, page 113; Encyclopaedia Britannica, volume 10, pages 398–399. On the other hand, most of the familiar solids are crystalline. Collier's Encyclopedia, volume 9, page 113.

In the production of vitrified ceramic ware, glass is formed within the ceramic body by the fusion of silica with other ingredients. This fluid glass forms a matrix or binder, holding together the undissolved particles of the less fusible materials. Encyclopedia Americana, volume 6, page 220; Collier's Encyclopedia, volume 9, page 113; Van Nostrand's Scientific Encyclopedia, page 225.

In the production of the ferrite articles involved herein, there was no conversion to glass in the process; there was no glass present in the body structure; the structures were crystalline; and glass did not form a binder, the binding materials being vegetable gums, gum arabic, gomme-gutte, and polyvinyl alcohol.

It is evident, therefore, that the ferrite articles before the court did not have vitrified bodies, that is, they had not been converted wholly, partially, or externally into glass or a glassy substance, nor do they resemble glass in structure. A visual examination of the samples shows that they are not like glass in luster, color, brittleness, or translucency, nor do they appear to be covered with a glaze.

The mere fact that these articles may show a vitrified, vitreous, semivitrified, or semivitreous fracture when broken does not establish that they are vitrified ware, since the statute requires that they have vitrified bodies. Other substances than glass may show a vitreous or conchoidal fracture (Dana's Manual of Mineralogy, p. 95; Kraus, Edward Henry, Mineralogy, p. 105); such fracture does not indicate that the body structure is wholly or partly glass (R. 77–78).

Plaintiff claims, nevertheless, that this merchandise is classifiable as vitrified ware on the alleged ground that chemical porcelain ware and chemical stoneware do not necessarily have a glassy phase. In support of this proposition, a definition of chinaware in the Dictionary of Tariff Information is cited, in which it is said that hard porcelain is crystalline in structure. However, this follows statements that chinaware is made of clays burned at an intense heat so as to become glassy or vitrified in the interior and that there are three classes of chinaware, one of which is hard porcelain. In the Summary of Tariff Information, 1929, it is stated (p. 481):

Chemical porcelain is composed of a specially prepared body which is *completely vitrified* at a very high temperature. * * * [Emphasis supplied.]

Stoneware is made with a larger percentage of silica than earthenware, which, when fired, *vitrifies* the body. Funk & Wagnalls New Standard Dictionary, 1931 edition, under pottery.

It is evident, therefore, that the articles provided for in paragraph 212 are only those which have been vitrified to an appreciable degree. Thus, the articles involved herein which have not been vitrified or converted to glass to any extent cannot be classified as "other vitrified wares." Whether or not they resemble porcelain in physical characteristics, as is stated in the Kirk-Othmer Encyclopedia of Chemical Technology, volume 8, page 651, is immaterial, since the characteristic required by the statute is vitrification.

For the reasons stated, we hold that the ferrite articles involved herein are not classifiable under paragraph 212, as modified, *supra*, as other vitrified wares, composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture. They are properly dutiable, as assessed by the collector, at 15 per centum ad valorem under paragraph 214 of said tariff act, as modified, as articles, composed wholly or in chief value of earthy or mineral substances, not specially provided for, not decorated.

The protest is overruled and judgment will be rendered accordingly.